**No. 12-1422**

ORAL ARGUMENT SCHEDULED FOR MAY 15, 2013
_____

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**
_____

NATIONAL ASSOCIATION OF MANUFACTURERS,
CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, and
BUSINESS ROUNDTABLE,

Petitioners,

v.

SECURITIES AND EXCHANGE COMMISSION,

Respondent,

AMNESTY INTERNATIONAL USA and AMNESTY INTERNATIONAL LTD.,

Intervenors.
_____

On Review of a Final Order of the Securities and Exchange Commission
_____
FINAL BRIEF OF THE SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT
_____

GEOFFREY ARONOW
General Counsel

MICHAEL A. CONLEY
Deputy General Counsel

JOHN W. AVERY
Deputy Solicitor

TRACEY A. HARDIN
Assistant General Counsel

BENJAMIN L. SCHIFFRIN
Senior Litigation Counsel

DANIEL STAROSELSKY
Senior Counsel
Securities and Exchange Commission
100 F Street, NE
Washington, DC  20549
(202) 551-5774 (Staroselsky)

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A.     Parties**

All parties, intervenors, and amici appearing before the Commission and this Court are listed in the final brief for petitioners.

**B.     The Ruling Under Review**

On August 22, 2012, the Commission adopted the rule that petitioners challenge here, Rule 13p-1, in *Conflict Minerals*, Securities Exchange Act Release No. 62764, published in the Federal Register at 77 FR 56,274 (Sept. 12, 2012).

**C.     Related Cases**

The case on review has not previously been before this, or any other, Court. Counsel is not aware of any other related cases currently pending in this, or any other, Court.

# TABLE OF CONTENTS

**Page**

Certificate as to Parties, Rulings, and Related Cases ................................................i

Table of Authorities ................................................................................................v

Glossary ..................................................................................................................xi

Preliminary Statement ............................................................................................1

Jurisdictional Statement .........................................................................................4

Counterstatement of Issues ....................................................................................4

Statutes and Regulations ........................................................................................5

Counterstatement of the Case ................................................................................5

    A.    Nature of the Case ..............................................................................5

    B.    Background ..........................................................................................7

        1.    Conflict Minerals and the DRC .............................................7

        2.    Section 1502 of Dodd-Frank ...............................................10

        3.    The Rulemaking Proceeding ................................................12

            a.    The Commission attempted to reduce the rule's burdens while remaining faithful to Congress's intent. ..........................................................................13

                i.    Step one .........................................................13

                ii.    Step two .........................................................17

**TABLE OF CONTENTS (CONTINUED)**

**Page**

iii.    Step three .......................................................... 19

b.    The Commission considered the costs and benefits of the rule as well as its effects on efficiency, competition, and capital formation. ............................... 23

Standard of Review ..................................................................... 26

Summary of Argument ................................................................ 26

Argument ..................................................................................... 29

I.    The Commission Appropriately Considered the Economic Effects of the Rule. ..................................................................................... 29

A.    The Commission reasonably accepted Congress's determination that the disclosure requirements would achieve the desired social benefits. ............................................................................. 31

B.    The Commission did not err by engaging in a largely qualitative assessment of the marginal costs and benefits of its discretionary choices. ............................................................................... 34

C.    The Commission conducted a thorough quantitative analysis of the costs of the final rule. ............................................. 39

II.    The Commission Interpreted Section 1502 Reasonably. ............................. 43

A.    The Commission's determination not to adopt a *de minimis* exception was reasonable. ............................................... 43

B.    The Commission's interpretation of Section 1502 to include issuers who "contract to manufacture" products was reasonable. ................. 50

iii

**TABLE OF CONTENTS (CONTINUED)**

**Page**

      C.     The Commission's adoption of the reasonable country of origin inquiry was reasonable. ...................................................................54

      D.     The transition period the Commission adopted was reasonable. ...........................................................................60

III.    Section 1502 Does Not Violate the First Amendment. ...............................62

Conclusion ..............................................................................................67

Certificate of Compliance

Certificate of Service

# TABLE OF AUTHORITIES

**Cases**                                                                **Page**

*Aeronautical Repair Station Ass'n v. FAA*, 494 F.3d 161
    (D.C. Cir. 2007) ........................................................53

*Ala. Power Co. v. Costle*, 636 F.2d 323 (D.C. Cir. 1979) ......................................46

*Allied-Signal, Inc. v. NRC*, 988 F.2d 146 (D.C. Cir. 1993) ....................................67

*American Bus. Ass'n v. Rogoff*, 649 F.3d 734 (D.C. Cir. 2011) ............................26

*American Equity Inv. Life Ins. Co. v. SEC*, 613 F.3d 166
    (D.C. Cir. 2010) ........................................................35

*American Petroleum Inst. v. SEC*, No. 12-1398 (D.C. Cir. 2012) ............................4

*Ass'n of Private Sector Colleges and Universities v. Duncan*,
    681 F.3d 427 (D.C. Cir. 2012) ................................................26, 36

*Buckley v. Valeo*, 424 U.S 1 (1976) ......................................................63

*Business Roundtable v. SEC*, 647 F.3d 1144 (D.C. Cir. 2011) ........................30, 35

*Cablevision Sys. Corp. v.* FCC, 597 F.3d 1306 (D.C. Cir. 2010) ..........................37

*Catawba County v. EPA*, 571 F.3d 20 (D.C. Cir. 2009) ..................................44, 52

*Chamber of Commerce v. SEC*, 412 F.3d 133 (D.C. Cir. 2005) ....29, 35, 36, 37, 48

*Charles Peckat Mfg. Co. v. Jarecki*, 196 F.2d 849 (7th Cir. 1952) ......................53

*Charter Commc'ns, Inc. v. FCC*, 460 F.3d 31 (D.C. Cir. 2006) ..........................31

\* Authorities upon which we chiefly rely are marked with asterisks

v

## TABLE OF AUTHORITIES (CONTINUED)

**Cases (Continued)**                                                                  **Page**

*Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984) ...........................26

*ConocoPhillips Co. v. EPA*, 612 F.3d 822 (5th Cir. 2010) ....................................37

*\*Consumer Elec. Ass'n v. FCC*, 347 F.3d 291 (D.C. Cir. 2003) ...............31, 38, 41

*Davis v. FEC*, 128 S.Ct. 2759 (2008) ...................................63

*Envtl. Def. Ctr. v. EPA*, 344 F.3d 832 (9th Cir. 2003) ........................62, 63

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ...................................37

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*,
      515 U.S. 557 (1995) ...................................63

*Inv. Co. Inst. v. Bd. of Governors of Fed. Reserve Sys.*, 551 F.2d 1270
      (D.C. Cir. 1977) ...................................4

*John Doe No. 1 v. Reed*, 130 S.Ct. 2811 (2010) ...................................63

*Meese v. Keene*, 481 U.S. 465 (1987) ...................................65

*Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241 (1974) ...................................63

*\*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto
      Insur. Co.,* 463 U.S. 29 (1983) ...........................30, 47

*Nat'l Ass'n. of Home Builders v. EPA*, 682 F.3d 1032 (D.C. Cir. 2012) ..............40

*Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1 (D.C. Cir. 2009) ...................................66

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104 (2d Cir. 2001) ...........................63

*Nat'l Lime Ass'n v. EPA*, 233 F.3d 625 (D.C. Cir. 2000) .......................................45

vi

## TABLE OF AUTHORITIES (CONTINUED)

**Cases (Continued)** **Page**

*Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294 (1st Cir. 2005) ........................62

*Public Citizen v. Fed. Motor Carrier Safety Admin.*,
  374 F.3d 1209 (D.C. Cir. 2004) ...................................................33

*\*Public Citizen v. FTC*, 869 F.2d 1541 (D.C. Cir. 1989) ....................34, 45, 46, 49

*Public Citizen v. Young*, 831 F.2d 1108 (D.C. Cir. 1987) ......................................44

*Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781 (1988) ..............................63

*R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205 (D.C. Cir. 2012) ..............65, 66

*Safari Club Int'l v. Salazar*, No.11-5219 (D.C. Cir. Mar. 1, 2013) .......................30

*Sierra Club v. EPA*, No. 10-1413, 2013 WL 216018 (D.C. Cir. Jan. 22, 2013) ....49

*State of Cal. v. Watt*, 712 F.2d 584 (D.C. Cir. 1983) ...............................................38

*Stilwell v. Office of Thrift Supervision*, 569 F.3d 514 (D.C. Cir. 2009) ...........34, 35

*United States v. United Foods, Inc.*, 533 U.S. 405 (2001) ......................................63

*United States v. Western Elec. Co.*, 894 F.2d 1387 (D.C. Cir. 1990) ...............52, 53

*Vonage Holdings Corp. v. FCC*, 489 F.3d 1232 (D.C. Cir. 2007) ........................36

*West Virginia Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ...............................63

*Wooley v. Maynard*, 430 U.S. 705 (1977) ..............................................................63

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*,
  471 U.S. 626 (1985) ......................................................................65

vii

**TABLE OF AUTHORITIES (CONTINUED)**

**Statutes and Rules**                                                      **Page**

Securities Exchange Act of 1934, 15 U.S.C. 78aa, et seq.

  Section 3(f), 15 U.S.C. 78c(f) ...........................................................29
  Section 13(p), 15 U.S.C. 78m(p) .......................................................5
  Section 13(p)(1)(A), 15 U.S.C. 78m(p)(1)(A) ................................10, 11, 54
  Section 13(p)(1)(A)(i), 15 U.S.C. 78m(p)(1)(A)(i) ....................................11
  Section 13(p)(1)(A)(ii), 15 U.S.C. 78m(p)(1)(A)(ii) .......................11, 20, 51
  Section 13(p)(2)(B), 15 U.S.C. 78m(p)(2)(B) .....................................10
  Section 13(p)(3), 15 U.S.C. 78m(p)(3) ..............................................32
  Section 13(p)(4), 15 U.S.C. 78m(p)(4) ..............................................32
  Section 23(a)(2), 15 U.S.C. 78w(a)(2) .........................................29, 38
  Section 25(a), 15 U.S.C. 78y(a) .......................................................4
  Section 36(a)(1), 15 U.S.C. 78mm(a)(1) ...........................................46

Dodd-Frank Wall Street Reform and Consumer Protection Act, PL 111-203, 124
Stat. 1376 (2010)

  Section 1502 ...............................................................................5
  Section 1502(a) .....................................................................7, 31
  Section 1502(c)(1)(A) ..........................................................12, 32
  Section 1502(c)(2)(A) ................................................................12
  Section 1502(d) .........................................................................11
  Section 1502(d)(2)(A) ................................................................32
  Section 1502(e)(4) .......................................................................5
  Section 1504 .......................................................................16, 44

Democratic Republic of the Congo Relief, Security and Democracy
Promotion Act of 2006, PL 109-456

  Section 101(5) .............................................................................7
  Section 101(7) .............................................................................7
  Section 102(8)(A) .........................................................................8

Rule 13p-1, 17 C.F.R. 240.13p-1 ............................................................5

**TABLE OF AUTHORITIES (CONTINUED)**

**Statutes and Rules (Continued)**                                    **Page**

Adopting Release, *Conflict Minerals*, 77 FR 56,274 (Sept. 12, 2012) ............5, 6, 9
12, 13, 14, 15, 16, 17,
18, 19, 20, 21, 22, 23,
24, 25, 26, 27, 30, 31,
33, 34, 35, 36, 37, 38,
39, 40, 41, 42, 43, 44,
45, 46, 47, 48, 49, 50,
51, 53, 54, 55, 56, 58,
59, 60, 61, 64

Proposing Release, *Conflict Minerals*, 75 FR 80,948 (Dec. 23, 2010) ............12, 36

**Miscellaneous**

LOUIS BRANDEIS, OTHER PEOPLE'S MONEY (1933) .................................................66

Conflict Coltan and Cassiterite Act of 2008, S. 3058, 110th Cong. (2008)..............9

Conflict Minerals Trade Act, H.R. 4128, 111th Cong. (2009) .................................9

Congo Conflict Minerals Act of 2009, S. 891, 111th Cong. (2009) ......................10

Exec. Order No. 13,413, 71 FR 64,105 (Oct. 31, 2006) ..........................................9

U.N. Security Council Resolution 1376 (2001).........................................................8

U.N. Security Council Resolution 1857 (2008).........................................................8

USAID, *The Responsible Minerals Trade (RMT) Program* (Oct. 2012) .........57, 58

U.S. Department of State, 2011 Human Rights Report for the DRC ..................7, 8

**TABLE OF AUTHORITIES (CONTINUED)**

**Miscellaneous (Continued)**                                                                 **Page**

U.S. Department of State, Statement Concerning Implementation of
     Section 1502 of the Dodd-Frank Legislation Concerning Conflict
     Minerals Due Diligence (July 15, 2011) ........................................................8

U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-08-188, THE DEMOCRATIC REPUBLIC
     OF THE CONGO: SYSTEMATIC ASSESSMENT IS NEEDED TO DETERMINE
     AGENCIES' PROGRESS TOWARD U.S. POLICY OBJECTIVES (2007) ...............8, 9

U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-12-763, CONFLICT MINERALS RULE:
     SEC'S ACTIONS AND STAKEHOLDER-DEVELOPED INITIATIVES (2012) ...7, 8, 9, 58

155 Cong. Rec. S4696 (Apr. 23, 2009) (statement of Sen. Brownback) ..............10

155 Cong. Rec. S4697 (Apr. 23, 2009) (statement of Sen. Feingold) ............ 10, 31

156 Cong. Rec. S3976 (May 19, 2010) (statement of Sen. Feingold) ...................10

# GLOSSARY

| | |
|---|---|
| Academics Br. | Brief of *Amicus Curiae* Experts on the Democratic Republic of the Congo in Support of Petitioners |
| Adopting Release | *Conflict Minerals*, 77 FR 56,274 (Sept. 12, 2012) |
| APA | Administrative Procedure Act |
| Br. | Opening Brief of Petitioners National Association of Manufacturers, Chamber of Commerce of the United States of America, and Business Roundtable |
| Commission or SEC | Securities and Exchange Commission |
| Conflict minerals | Columbite-tantalite, cassiterite, gold, wolframite or their derivatives, as well as any other minerals or their derivatives that the State Department determines to be financing conflict in the DRC or an adjoining country.  *See* Dodd-Frank Section 1502(e)(4). |
| Conflict Minerals Report | The report required by Section 13(p)(1)(A) of the Exchange Act |
| Covered Countries | The DRC or an adjoining country |
| Dodd-Frank | Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, 124 Stat. 1376 (2010) |
| DRC | The Democratic Republic of the Congo |
| Exchange Act | Securities Exchange Act of 1934 |

xi

**GLOSSARY (CONTINUED)**

FR                                      Federal Register

Industry Br.                            Industry Coalition Amici Brief in
                                        Support of Petitioners

NAM                                     Petitioner National Association of
                                        Manufacturers

OECD                                    Organisation for Economic Co-operation
                                        and Development

No. 12-1422

ORAL ARGUMENT SCHEDULED FOR MAY 15, 2013
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

NATIONAL ASSOCIATION OF MANUFACTURERS,
CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, and
BUSINESS ROUNDTABLE,

Petitioners,

v.

SECURITIES AND EXCHANGE COMMISSION,

Respondent,

AMNESTY INTERNATIONAL USA and AMNESTY INTERNATIONAL LTD.,

Intervenors.
_____

On Review of a Final Order of the Securities and Exchange Commission
_____

FINAL BRIEF OF THE SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT
_____

PRELIMINARY STATEMENT

In enacting Section 1502 of the Dodd-Frank Wall Street Reform and

Consumer Protection Act ("Dodd-Frank"), Congress expressly stated its sense that

1

"the exploitation and trade of conflict minerals is helping to finance conflict

characterized by extreme levels of violence in the eastern Democratic Republic of

the Congo [("DRC")], particularly sexual- and gender-based violence, and

contributing to an emergency humanitarian situation therein."  Congress

determined that this humanitarian crisis warranted new disclosure requirements

concerning the use of "conflict minerals" originating in the DRC or an adjoining

country, and Congress directed the Commission to promulgate rules embodying

those new requirements.  The Commission adopted Rule 13p-1 to carry out that

mandate.

Petitioners' principal challenges to Rule 13p-1 share a fundamental flaw:

they assume the Commission is authorized to second-guess and recalibrate policy

judgments Congress made when it ordered the Commission to promulgate that

rule.  This novel and erroneous view animates their argument that the Commission

was precluded from implementing Congress's directive unless it independently

confirmed Congress's judgment that the statutorily mandated disclosure regime

would produce the humanitarian benefits Congress intended.  It also underlies their

arguments that the Commission was required to use its interpretive and exemptive

authority to adopt proposed alternatives that would reduce the statute's costs even

where the Commission concluded that doing so would undermine congressional

2

intent.  But neither the Administrative Procedure Act ("APA") nor the Commission's obligation to determine as best it can the economic implications of its rules gives the agency license to frustrate Congress's purposes based on its own re-weighing of the benefits and burdens of Congress's choices.

In enacting Section 1502, Congress determined that the required disclosures will further the goals of the statute, and the Commission's judgments were therefore properly based on obedience to that policy choice.  Rather than second-guessing Congress's judgment by weighing whether the disclosures would promote the statute's humanitarian goals, the Commission reasonably weighed whether its choices would provide the disclosure that Congress determined would further those goals.

In conducting that analysis, the Commission thoroughly considered the economic consequences of the rule.  It appropriately analyzed the empirical data commentators provided to produce a detailed estimate of the costs of the final rule. The Commission also provided a comprehensive qualitative analysis of its major discretionary choices.  And the Commission's choices themselves were reasonable in light of the correct reading of the statutory language, congressional intent, and the evidence in the extensive administrative record.

3

## JURISDICTIONAL STATEMENT

Section 25(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. 78y(a), which authorizes court of appeals review of "orders," gives this Court, rather than a district court, jurisdiction over this petition for review.  *See Inv. Co. Inst. v. Bd. of Governors of Fed. Reserve Sys.*, 551 F.2d 1270, 1276-78 (D.C. Cir. 1977).[1]

## COUNTERSTATEMENT OF ISSUES

1.      Did the Commission satisfy its obligation to determine as best it can the economic implications of the rule by providing a thorough quantitative analysis of the rule's costs, accepting Congress's determination that the rule would have benefits, and analyzing qualitatively the costs and benefits of its discretionary decisions?

2.      Did the Commission act reasonably in (a) declining to include a *de minimis* exception where such an exception would thwart the purpose of the statute; (b) including issuers that contract to have products manufactured where failing to do so would undermine Congress's intent and make the statute internally inconsistent; (c) requiring issuers to conduct a reasonable country of origin inquiry

---

[1]  The issue of appellate jurisdiction to review Commission rules is currently being considered in *American Petroleum Inst. v. SEC*, No. 12-1398 (D.C. Cir. Nov. 1, 2012) (per curiam order).

4

to make the statutorily required determination "whether" their minerals originated in the DRC or adjoining countries; and (d) adopting a longer transition period for smaller issuers than for larger issuers?

3.     Does Section 1502 violate the First Amendment by requiring that issuers disclose factual information about their products?

**STATUTES AND REGULATIONS**

The pertinent statutes and regulations are contained in the Addendum to petitioners' brief.

**COUNTERSTATEMENT OF THE CASE**

**A.     Nature of the Case**

Section 1502 of Dodd-Frank, 124 Stat. 1376 (2010), added Section 13(p) of the Exchange Act, 15 U.S.C. 78m(p), which requires the Commission to promulgate disclosure regulations regarding the use of "conflict minerals" from the DRC or an adjoining country.  *See Conflict Minerals*, Final Rule, 77 FR 56,274, 56,275/1-2 (Sept. 12, 2012), JA0719, 0720/1-2 ("*Adopting Release*").[2]

Rule 13p-1, 17 CFR 240.13p-1, promulgated pursuant to this directive, establishes a three-step process for compliance.  The *first* step requires companies

---

[2]  Section 1502(e)(4) defines "conflict mineral" as columbite-tantalite, cassiterite, gold, wolframite or their derivatives, as well as any other minerals or their derivatives that the State Department determines to be financing conflict in the DRC or an adjoining country.

5

that file reports with the Commission to determine whether they are subject to the requirements of the rule because conflict minerals are "necessary to the functionality or production of a product" they manufacture or contract to have manufactured. *Adopting Release*, JA0724/2.

The *second* step requires issuers subject to the rule to "conduct a reasonable country of origin inquiry" to determine whether any of their conflict minerals originated in the DRC or an adjoining country ("Covered Countries") or are from recycled or scrap sources. *Id.* at JA0725/2. If, after this inquiry, issuers have no reason to believe that their conflict minerals may have originated in the Covered Countries or reasonably believe that their conflict minerals are from recycled or scrap sources, they need not proceed to step three. *Id.* at JA0726/1.

Otherwise, issuers move to the *third* step, which requires them to exercise due diligence regarding the source and chain of custody of their conflict minerals and, in certain circumstances, to submit an audited report. *Id.*

Petitioners filed a petition for review challenging Section 1502 and requesting that Rule 13p-1 be modified or set aside in whole or in part. Petition for Review 2.

6

**B.     Background**

**1.     Conflict Minerals and the DRC**

The DRC is "a vast, mineral-rich nation."  U.S. GOV'T ACCOUNTABILITY

OFFICE, GAO-12-763, CONFLICT MINERALS RULE:  SEC'S ACTIONS AND

STAKEHOLDER-DEVELOPED INITIATIVES 3 (2012).  After the overthrow of an

authoritarian regime in 1997 (*id.* at 3-5), "one of the deadliest conflicts since

World War II" erupted in the DRC.  Democratic Republic of the Congo Relief,

Security, and Democracy Promotion Act of 2006, PL 109-456, § 101(7) ("2006

DRC Act").  The conflict, which has "spawned some of the world's worst human

rights atrocities" (2006 DRC Act § 101(5)), continues to this day.  *See generally*

GAO-12-763.

This conflict is fueled in part by the illegal exploitation and trade of natural

resources in eastern DRC.  *See* Dodd-Frank § 1502(a).  As the State Department

has explained, the "[c]landestine trade in minerals and other natural resources

facilitate[s] the purchase of small arms to commit abuses and reduce[s]

government revenues needed for increasing security and rebuilding the country."

U.S. Department of State, 2011 Human Rights Report for the DRC 15, *available at*

http://tinyurl.com/affovem, *cited in* GAO-12-763 at 27.  The natural resources

"most used to generate direct and indirect financing for armed actors and conflict"

are cassiterite (tin ore), coltan (tantalum ore), wolframite (tungsten ore), and gold. *Id*.

The United Nations Security Council has long condemned the exploitation of the DRC's natural resources and has encouraged due diligence with respect to the origin of conflict minerals. U.N. Security Council Resolutions 1376 ¶8 (2001), 1857 ¶15 (2008); *see also* U.S. Department of State, Statement Concerning Implementation of Section 1502 of the Dodd-Frank Legislation Concerning Conflict Minerals Due Diligence 3 (July 15, 2011) (noting and encouraging efforts to develop a comprehensive regional certification mechanism and other tools concerning the supply chain in the four conflict minerals).

Over the past decade, the United States has also taken numerous measures in response to the exploitation of conflict minerals in the DRC. *See* GAO-12-763 at 5-6. In 2006, for example, Congress enacted legislation declaring its view that United States policy should be to, among other things, "make all efforts" to ensure that the government of the DRC "is committed to responsible and transparent management of natural resources across the country." 2006 DRC Act § 102(8)(A). Pursuant to this Act, the United States allocated hundreds of millions of dollars to provide the DRC humanitarian aid, debt relief, training, and other assistance. *See generally* U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-08-188, THE DEMOCRATIC

8

REPUBLIC OF THE CONGO: SYSTEMATIC ASSESSMENT IS NEEDED TO DETERMINE AGENCIES' PROGRESS TOWARD U.S. POLICY OBJECTIVES (2007), *cited in* GAO-12-763; *see also Adopting Release*, JA0720 n.12; Exec. Order No. 13,413, 71 FR 64,105 (Oct. 31, 2006) (the humanitarian crisis in the DRC poses an "unusual and extraordinary threat to the foreign policy of the United States").  And in 2011, the State Department and USAID, in collaboration with NGOs, industry, and other governments, launched the Public-Private Alliance for Responsible Minerals Trade to support supply chain solutions to conflict minerals challenges in the DRC and neighboring countries.  GAO-12-763 at 6.

After the 2006 DRC Act was enacted, the Senate considered two bills more directly aimed at the illicit minerals trade in the DRC.  The first would have banned importing certain products that contained or were derived from columbite-tantalite or cassiterite originating in the DRC.  *See* Conflict Coltan and Cassiterite Act of 2008, S. 3058, 110th Cong. (2008); *see also* Conflict Minerals Trade Act, H.R. 4128, 111th Cong §§ 6, 7 (2009) (requiring auditing of facilities that process conflict minerals and prohibiting the importation of certain articles containing conflict minerals).  The second, like Section 1502, would have required companies using columbite-tantalite, cassiterite, or wolframite to disclose annually to the

9

Commission the country of origin of those minerals.  *See* Congo Conflict Minerals Act of 2009 ("2009 DRC Act"), S. 891, 111th Cong. § 5 (2009).

In explaining the change from a proscriptive to a disclosure approach, one co-sponsor of the 2009 DRC Act stated that "we must tread carefully…. All-out prohibitions or blanket sanctions could be counterproductive and negatively affect the very people we seek to help…. [T]his bill is sensitive to that complex reality." 155 Cong. Rec. S4697 (daily ed. Apr. 23, 2009) (statement of Sen. Feingold).  He added that "[b]ringing transparency to those supply chains may not be easy, but it is something we can and should expect of industry when certain commodities are known to be fueling human rights violations."  *Id.*; *see also id.* at S4696 (statement of Sen. Brownback).

**2.    Section 1502 of Dodd-Frank**

Section 1502 of Dodd-Frank was modeled on the 2009 DRC Act.  *See* 156 Cong. Rec. S3976 (daily ed. May 19, 2010) (statement of Sen. Feingold).  It adds a new Section 13(p) to the Exchange Act, which directs the Commission to promulgate regulations requiring companies to disclose annually whether conflict minerals "necessary to the functionality or production" of a product they manufacture originated in the Covered Countries.  Exchange Act § 13(p)(1)(A), (2)(B).  If so, these companies must submit a report to the Commission ("Conflict

10

Minerals Report"). *Id.* § 13(p)(1)(A).  Section 13(p) specifies that the Conflict

Minerals Report must include "a description of the measures taken by the person to

exercise due diligence on the source and chain of custody of" its conflict minerals,

"which measures shall include an independent private sector audit" of the report.

*Id.* § 13(p)(1)(A)(i).

The report must also include "a description of the products manufactured or

contracted to be manufactured that are not DRC conflict free," with "DRC conflict

free" defined to mean "the products that do not contain minerals that directly or

indirectly finance or benefit armed groups in the Democratic Republic of the

Congo or an adjoining country."  *Id.* § 13(p)(1)(A)(ii).  Finally, the report must

include a description of "the facilities used to process the conflict minerals," their

country of origin, and the efforts to determine the mine or location of origin "with

the greatest possible specificity."  *Id.*

Other subsections of Section 1502 require regular reporting to Congress

from other federal agencies regarding conditions in the DRC and the effectiveness

of Section 13(p)'s disclosure regime.  For example, the Comptroller General must

submit annual reports assessing "the rate of … violence in war-torn areas of the"

Covered Countries and "the effectiveness of section 13(p) … in promoting peace

and security in the" Covered Countries.  Section 1502(d).  And the Secretary of

11

State must produce and make publicly available a map of "mineral-rich zones, trade routes, and areas under the control of armed groups" in the Covered Countries, as well as submit to Congress "a strategy to address the linkages between human rights abuses, armed groups, mining of conflict minerals, and commercial products." Section 1502(c)(1)(A), (c)(2)(A)(i)-(ii).

### 3.    The Rulemaking Proceeding

On July 27, 2010, before proposing a rule, the Commission solicited comment regarding Section 1502's required disclosure. *See* http://www.sec.gov/news/press/2010/2010-135.htm. After reviewing the comments received, the Commission proposed rules to implement Section 1502. *Conflict Minerals*, 75 FR 80,948 (Dec. 23, 2010).

At the request of interested parties, the Commission extended the comment period deadline from January 31, 2011 until March 2, 2011. *Adopting Release*, JA0722/3 & n.32. In addition, on October 18, 2011, the Commission held a public roundtable regarding the required disclosure and thereafter requested further comment. *Id.* at JA0722/3. In the end, the Commission received approximately 420 individual comment letters in response to the proposed rule, more than 13,000 form letters supporting Section 1502, and two petitions with a total of more than 25,000 signatures supporting the proposed rule. *Id.* at JA0722/3-0723/1.

12

Commissioners and staff also met with numerous interested parties. *See* http://sec.gov/comments/s7-40-10/s74010.shtml. The Commission adopted the final rule, Rule 13p-1, on August 22, 2012.

### a. The Commission attempted to reduce the rule's burdens while remaining faithful to Congress's intent.

Recognizing that the rule would "impose significant compliance costs on companies who use or supply conflict minerals," the Commission incorporated changes from the proposal to "reduce the burden of compliance in areas in which [it had] discretion while remaining faithful to the language and intent of" Section 1502. *Adopting Release*, JA0724/1-2. The Commission thus rejected several more costly alternative proposals and accepted numerous recommendations to reduce issuers' compliance burdens. In some circumstances, however, such as those petitioners challenge, the Commission determined that recommended alternatives would undermine the scheme Congress envisioned.

### i. Step one

The Commission faced a number of threshold determinations about the scope of Congress's mandated disclosure regime. For example, two co-sponsors of Section 1502 submitted a comment letter stating that they intended the disclosure requirement to apply to non-reporting companies. *Adopting Release*, JA0731/2.

13

Noting the provision's legislative background and location within the Exchange Act, however, the Commission limited the final rule to *reporting* issuers.  *Id.* at JA0732/2-3.

The Commission acknowledged that conflict minerals can be necessary to the production of an issuer's product, and therefore within the terms of the statute, even if they are washed away or consumed in the production process.  *Id.* at JA0739/2.  Nevertheless, because Section 1502 defines "DRC Conflict Free" to mean products that do not "contain" minerals that finance armed groups in the Covered Countries, the Commission limited the rule so that "only a conflict mineral that is *contained* in the product should be considered 'necessary to the functionality or production' of that product."  *Id.* at JA0741/1-2 (emphasis added). The rule is also limited to products containing conflict minerals that are intentionally added.  *Id*. at JA0741/3.

The Commission did include within the scope of the rule issuers who "contract to manufacture" products containing necessary conflict minerals, rather than limiting it to those who themselves manufacture such products.  The Commission recognized that Section 1502 defines a "person described," and therefore subject to the disclosure requirements, as one for whom conflict minerals are necessary to the functionality or production of a product "manufactured by

14

such person." *See id.* at JA0733/3. Congress, however, also required issuers "that

must file a Conflict Minerals Report to describe their 'products manufactured *or*

*contracted to be manufactured* that are not DRC conflict free.'" *Id.* at JA0736/1

(emphasis in release). In light of this second provision, the Commission reasoned

that "including issuers who contract to manufacture their products in the scope of

the rule effectuates [Congress's] intent." *Id.*

The Commission received "mixed comments regarding whether the final

rule should have a *de minimis* threshold exception." *Id.* at JA0740/1. The State

Department wrote that because conflict minerals are used "often in very limited

quantities, such a change could have a significant impact on the proposed

regulations." State Department JA0445; *see also* Matheson JA0602 (*de minimis*

exception would "destroy the intent of the law"); Calvert JA0581 (although a per-

product *de minimis* threshold "may appear reasonable … the volume adds up in

large quantity of units," and providing a *de minimis* exception would "risk

significant dilution of coverage of the law"). And in a pre-proposal comment

letter, Section 1502's co-sponsors wrote that they "carefully considered," but

deliberately excluded, a *de minimis* exception, instead relying on the "necessary to

the production or functionality" language to limit the scope of the statute. Durbin

JA0103.

Petitioners, on the other hand, argued that a *de minimis* exception was appropriate because Congress did not "expressly prohibit" such an exception and the Commission had inherent authority to create one.  NAM JA0396-0397; *see also* Chamber JA0260; BRT JA0274.

The Commission concluded that a *de minimis* exception would be inconsistent with the text, structure, and purpose of Section 1502.  *Adopting Release*, JA0740/1-2, 0743.  The Commission explained that Section 1502 "does not contain a *de minimis* exception" despite Congress's inclusion of such a threshold in Section 1504 of Dodd-Frank, which creates disclosure requirements for resource extraction issuers.  *Id.* at JA0743/1-2.  The Commission also noted that Congress included the "necessary to the functionality or production" threshold as an "express limiting factor" for Section 1502.  *Id.* at JA0743/1.  In the Commission's view, Congress understood that small amounts of conflict minerals could meet this requirement, yet chose not to include a *de minimis* exception.  *Id.* Moreover, the Commission concurred in the State Department's view in concluding that such a threshold would undermine the purpose of Section 1502.  *Id.* at JA0743/2-3.

16

### ii.     Step two

Under Section 1502, issuers that proceed past step one must disclose annually "whether" their necessary conflict minerals "did originate" in the Covered Countries.  Recognizing that it could be "quite costly," the Commission rejected a suggested approach that would have required all issuers to use due diligence to make this determination. *Adopting Release*, JA0759/1-2.  Instead, the final rule adopts the less burdensome reasonable country of origin inquiry.  *Id.* at JA0758. This standard permits issuers to "fully comply with the rule without conducting due diligence, obtaining an audit, or preparing and filing" a Conflict Minerals Report so long as, after reasonable inquiry, the issuers have "no reason to believe that [their] necessary conflict minerals may have originated in the Covered Countries." *Id.* at JA0789/1.

Many commentators, including one petitioner, supported the "reasonable country of origin proposal." *See, e.g.*, NAM JA0683.  But petitioners and others raised concerns regarding the contours of this inquiry. *See, e.g.*, NAM JA0386-0387; BRT JA0274-0275.  In response, the Commission tailored the rule.  It recognized that the inquiry could "differ among issuers" and that what constituted reasonableness would "depend on the available infrastructure at a given time." *Adopting Release*, JA0756/3.  The Commission also clarified that issuers would be

17

able to comply by "seek[ing] and obtain[ing] reasonably reliable representations" from their suppliers. *Id.* at JA0757. Issuers are not "required to receive representations from all of [their] suppliers." *Id.* at JA0757/2. Moreover, the Commission emphasized that findings need not be made to a "certainty." *Id.* at JA0759/2. *Compare* NAM JA0386-0389 (requesting all these features).

The Commission also altered the rule's treatment of issuers who, after a reasonable inquiry, were unable to determine the origin of their conflict minerals. The proposal required such issuers to exercise due diligence even if they did not have a reason to believe their conflict minerals originated in the Covered Countries. Some commentators supported this approach. *Adopting Release*, JA0758/3 (citing comments). Others did not, and the Commission recognized that requiring due diligence for all issuers who were unable to determine that their conflict minerals did not originate in the Covered Countries would require issuers to "prove a negative" in order to avoid due diligence. *Id.* at JA0759/1.

In the Commission's view, however, reading the statute as petitioners did in their comment letters—to require due diligence and a Conflict Minerals Report only when issuers know with certainty that their conflict minerals originated in the Covered Countries—would "undermine the goals of the statute." *Id.* That approach would give issuers an "incentive … to avoid learning the ultimate source

18

of the minerals." *Id.* Instead, the Commission adopted a "reason to believe" approach under which issuers must perform due diligence if they encounter a reason to believe their minerals may have originated in the Covered Countries. Thus, issuers cannot ignore warning signs regarding the origin of their conflict minerals. *Id.* at JA0758/2. This approach is consistent with the due diligence guidance provided by the Organisation for Economic Co-operation and Development ("OECD"). *Id.*

The Commission also changed the requirements for conflict minerals from recycled or scrap sources. *Id.* at JA0774/3. The Commission agreed with commentators that "[n]o further revenue or other benefit will be provided to the armed groups" from the use of these materials. *Id.* at JA0777/1. Thus, under the final rule, an issuer must exercise due diligence only if it "has reason to believe, as a result of its reasonable country of origin inquiry, that its conflict minerals may *not* have been from recycled or scrap sources," and must provide a Conflict Minerals Report only if it is *not* able to determine, as a result of its due diligence, "that the conflict minerals came from recycled or scrap sources." *Id.*

### iii.    Step three

Under step three of the rule, issuers who know or have reason to believe that their necessary conflict minerals may have originated in the Covered Countries and

19

did not come from recycled or scrap material must perform due diligence on the source and chain of custody of their conflict minerals. If, as a result of that due diligence, issuers determine that their conflict minerals did not originate in the Covered Countries, or that their conflict minerals came from recycled or scrap sources, no Conflict Minerals Report is required. *Adopting Release*, JA0758/1.

Otherwise, issuers are required to submit a Conflict Minerals Report. *Id.* Section 1502 dictates the contents of such a report. It must include a description of the issuer's due diligence, which "shall include" a certified independent private sector audit of the issuer's report, and a description of: the issuer's products that are not DRC conflict free as defined in the statute; the facilities used to process the issuer's conflict minerals; the country of origin of those minerals; and the efforts to determine the mine or location of origin "with the greatest possible specificity." Section 13(p)(1)(A)(ii).

Because issuers with a product containing conflict minerals of an undeterminable origin cannot know that their product is "DRC conflict free," the proposed rule would have required such issuers to provide an audited Conflict Minerals Report and describe their product as "not DRC conflict free." *Adopting Release*, JA0762/2-3. Many commentators supported this approach. *Id.* at JA0763/1-2. Other commentators, however, expressed concerns that many issuers

20

would be unable to determine the origin of their conflict minerals in the near term (*id.* at JA0753-0754, 0766) and that this approach could lead to incorrect and misleading disclosures if issuers were unable to determine the origin of their conflict minerals. *Id.* at JA0766/3.

The Commission therefore modified the final rule to provide a temporary period during which issuers may describe their products as "DRC conflict undeterminable." *Id.* at JA0766/2. During this period, issuers that are unable to determine whether their conflict minerals originated in the Covered Countries, directly or indirectly financed or benefitted armed groups in the Covered Countries, or came from recycled or scrap sources must still file a Conflict Minerals Report. But they are permitted to describe their products as "DRC conflict undeterminable" and are not required to obtain an independent private sector audit of their report. This alternative is permitted for the first two reporting cycles (2013 and 2014) for all issuers, and the first four reporting cycles (2013 through 2016) for smaller reporting companies. *Id.* at JA0754-0755, 0766/3-0767/1.

"Based on the comments," the Commission concluded that the two-year transition period available to all issuers would "allow viable tracking systems to be put in place in the Covered Countries and throughout supply chains and avoid a *de-*

21

*facto* embargo on conflict minerals from the Covered Countries." *Id.* at

JA0767/3.[3]  The Commission also reasoned that extending the transition period for

smaller companies to four years is "appropriate because these issuers may lack the

leverage to obtain detailed information regarding the source of a particular conflict

mineral." *Id.* at JA0768/1.

And although issuers cannot describe their products as "DRC conflict

undeterminable" after the expiration of this temporary period, the Commission also

changed the language of the required disclosure.  Under the final rule, after this

---

[3]  The Commission received conflicting comments regarding whether Section 1502
would result, or already had resulted, in a *de facto* embargo on conflict minerals
from the Covered Countries, thereby exacerbating conditions in the DRC.
*Adopting Release*, JA0723, 0780 & nn.719-20, 0795 n.821.  Many, including
Members of Congress, the UN Group of Experts for the DRC, and civil society and
human rights groups operating in the region, supported Section 1502 and stated
that it was yielding positive results on the ground.  Boxer JA0675; Leahy JA0678;
UN Group of Experts JA0592; North Kivu Civil Society Groups JA0483; Enough
JA0688; ICAR JA0493; *see also* Matheson JA0602 (minerals "continue to be
sourced in substantial volumes from the DRC" and private industry had made
efforts "to increase supply from the region"); ICAR JA0493 ("major international
companies [had] unveil[ed] plans to invest in and source from mines in areas of
Congo covered by the law"); Global Witness JA0512.  One commentator
acknowledged that there had been an initial drop in mineral exports after the
passage of Dodd-Frank, but attributed the downturn to actions "by the Congolese
government and an overly restrictive interpretation of Dodd Frank by industry
associations."  ICAR JA0493.  Of those that argued that a *de facto* embargo would
result (*see* Br.17-18), many asserted that the problem could be ameliorated by
providing a phase-in period and/or interpreting the statute to apply only to newly
mined minerals (as the Commission did).  CEI JA0488; IPC JA0333; Pact JA0514;
Verizon JA0454.

period, issuers must identify in their Conflict Minerals Report their products that have "not been found to be 'DRC conflict free.'" *Id.* at JA0767/1. Issuers can also add disclosure or clarification. *Id.*; *see also* n.562.

Addressing comments, the Commission concluded that this approach comported with the First Amendment. Requiring issuers that cannot definitively determine the origin of their minerals to "state that their products have not been found to be 'DRC conflict free' compels an accurate disclosure in light of the statutory definition of 'DRC conflict free.'" *Id.* at JA0768/2. In addition, this revised language, the ability of issuers to add additional explanation, and the temporary "undeterminable" period "all represent accommodations to ensure that the rule is appropriately tailored to lessen the impact on First Amendment interests while still accomplishing Congress's objective." *Id.*

> **b.      The Commission considered the costs and benefits of the rule as well as its effects on efficiency, competition, and capital formation.**

The Commission engaged in an in-depth economic analysis. *Adopting Release*, JA0789/2. In considering the rule's effect on efficiency, the Commission noted that the rule could improve informational efficiency by providing investors with material information regarding the risks of investing in an issuer or its supply

23

chain, but could result in a loss of allocative efficiency because the cost of compliance will be borne by shareholders. *Id.* at JA0795/3.

The Commission also concluded that it did "not expect any effects of the rule on [] competition in the United States securities markets," but that there may be some competitive disadvantage to issuers subject to the rule in their respective industries. *Id*. at JA0795/2 & n.822. Given Section 1502's mandatory nature, however, the Commission determined that any potential burden on competition was necessary and appropriate in furtherance of the purposes of Section 13(p) of the Exchange Act. *Id.* at JA0795/3. The Commission concluded that there would be no effect on capital formation. *Id*. at JA0796/1.

The Commission also considered the economic effects of the rule by quantifying those effects where possible and otherwise providing a qualitative analysis. The Commission first recognized that Congress enacted Section 1502 to achieve the "compelling social benefit[]" of decreasing conflict and violence in the DRC. *Id.* at JA0795/1-2. While the Commission received a number of comments fiercely debating whether the disclosure regime would actually yield such a benefit (*see supra* note 3; *Adopting Release*, JA0780, 0795), it did not quantify these social benefits.

24

As the Commission explained, the humanitarian benefits Congress envisioned "are derived directly from the statute." *Id.* at JA0781/2. The Commission therefore "designed a final rule to help achieve the intended humanitarian benefits in the way that Congress directed" despite the costs. *Id.* Moreover, the Commission was unable to quantify the social benefits from the rule both because it did not have the data to do so and because it was not able to assess how effective Section 1502 will be in achieving those benefits. *Id.*; *see also id.* at JA0780/2-3.

The Commission did provide a detailed quantitative analysis of the costs of the final rule. *Id.* at JA0795-0799. It estimated the aggregate initial cost of compliance for the 5,994 issuers estimated to be affected by the rule to be between approximately $3 billion and $4 billion, and the annual ongoing cost of compliance to be between $207 million and $609 million. *Id.* at JA0782, 0796/2.

While the Commission also attempted to quantify the impact of its discretionary choices where possible (*id.* at JA0790 n.801, 0793 n.811), it was unable to quantify the impact of many of those choices. The Commission explained that "reliable, empirical evidence regarding the effects [was] not readily available to the Commission, and commentators did not provide sufficient information" to allow it to do so. *Id*. at JA0787/3. The Commission nonetheless

25

provided an extensive qualitative assessment that considered the relative costs and benefits of its significant discretionary choices. *Id*. at JA0787-0795.

## STANDARD OF REVIEW

This Court reviews an agency's interpretation of a statute that it implements under the two-step analysis of *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984). The Court first examines the statute de novo, and if the intent of Congress is clear, then the Court's task is at an end. *Id.* at 842-43. If, however, the statute is ambiguous, the Court must defer to the agency's interpretation unless it is "manifestly contrary to the statute." *Id.* at 844.

To survive arbitrary and capricious review under the APA, regulations must be "the product of reasoned decisionmaking." *Ass'n of Private Sector Colleges and Universities v. Duncan*, 681 F.3d 427, 441 (D.C. Cir. 2012). "In evaluating an agency's decisionmaking, [the Court's] review is 'fundamentally deferential.'" *Id.* (citation omitted).

This Court reviews constitutional challenges to a statute de novo. *American Bus. Ass'n v. Rogoff*, 649 F.3d 734, 737 (D.C. Cir. 2011).

## SUMMARY OF ARGUMENT

Congress considered the potential effects of conflict minerals disclosure and determined that the regime it adopted would ameliorate the humanitarian crisis in

the DRC.  The Commission reasonably deferred to that determination and, in fulfilling Section 1502's mandate, designed Rule 13p-1 "to help achieve the intended humanitarian benefits in the way that Congress directed." *Adopting Release*, JA0781/2.

In doing so, the Commission fulfilled its obligation to determine as best it can the economic implications of the rule.  It provided an extensive qualitative analysis of the costs and benefits of its discretionary choices.  The Commission also provided a thorough quantitative analysis of the costs of the final rule, and petitioners are simply incorrect that this analysis underestimates those costs.

Neither the APA nor this Court's case law imposed an obligation to go further and quantify either the rule's benefits or the marginal effect of *all* of the Commission's choices under the circumstances presented here.  Rather, in the context of a mandatory rule where quantitative data was largely unavailable, the decision to engage in a qualitative analysis in some instances was reasonable.  And to the extent petitioners argue that the rule is simply too burdensome, they provide no reason why the cost of Congress's mandate, in and of itself, is reason to vacate.

Petitioners also challenge the Commission's interpretations of Section 1502, arguing both that they impose undue costs and that they were unreasonable.  But petitioners' disagreement with Congress's determination that the mandated

27

disclosure scheme would yield benefits in the DRC does not provide a permissible basis for the Commission to undermine that scheme by adopting petitioners' preferred interpretations of the statute.

The Commission concluded that creating a *de minimis* exception would thwart, rather than advance, the purposes of the statute both because the text of the statute indicates such an exception was not intended and because small individual uses of conflict minerals can have large effects. This was consistent with the views of the State Department and many other commentators. Similarly, the Commission reasonably included issuers that contract to have products manufactured because Congress included products "contracted to be manufactured" in the reporting requirement in order to prevent manufacturers from evading that requirement.

The Commission also acted rationally in adopting the reasonable country of origin inquiry. Without a requirement to conduct due diligence if issuers encounter red flags in their reasonable country of origin inquiry, issuers would have an incentive to avoid learning the source of their minerals—thus undermining one of the fundamental requirements of Section 1502.

And the Commission reasonably provided a longer transition period for smaller issuers than for larger issuers because larger issuers will have greater leverage over their suppliers. Because some smaller suppliers in larger issuers'

28

supply chains may not even be issuers covered by the rule, and those that are will still be required to trace their minerals, there is no reason this accommodation for smaller issuers should preclude larger issuers from complying after two years.

Finally, Section 1502 does not violate the First Amendment. Like innumerable regulatory programs that require the disclosure of information about products, as implemented by Rule 13p-1 the statute compels disclosure of only factual information that does not burden protected speech.

**ARGUMENT**

## I.    The Commission Appropriately Considered the Economic Effects of the Rule.

The Exchange Act required the Commission to consider whether Rule 13p-1 "will promote efficiency, competition, and capital formation." Exchange Act Section 3(f), 15 U.S.C. 78c(f). As this Court has stated, this obligates the Commission to "determine as best it can the economic implications of the rule." *Chamber of Commerce v. SEC*, 412 F.3d 133, 143 (D.C. Cir. 2005). The Exchange Act also required the Commission to consider whether the rule "would impose a burden on competition not necessary or appropriate in furtherance of the purposes of" that Act. Exchange Act Section 23(a)(2), 15 U.S.C. 78w(a)(2).

29

In fulfilling these obligations, the Commission was not required, as petitioners and amici contend (Br.27-30; Academics Br.17-21; Industry Br.8), to second-guess the wisdom of Congress's determination that conflict minerals disclosure will yield social benefits in the form of decreasing conflict and violence in the DRC. Nor, as is clear from the statute, did Congress intend that the Commission do so. Thus, the Commission's economic analysis reasonably considered the degree to which its rule furthered that disclosure regime and the benefits of its rule to issuers and users of the information. *Adopting Release*, JA0781, 0787.

Properly framed in this manner, the Commission's economic analysis complied with the APA's requirements: The Commission "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Insur. Co.*, 463 U.S. 29, 43 (1983) (citation omitted); *see also Business Roundtable v. SEC*, 647 F.3d 1144, 1148 (D.C. Cir. 2011); *Safari Club Int'l v. Salazar*, No.11-5219, slip op. at 3 (D.C. Cir. Mar. 1, 2013). The release provides a thorough qualitative analysis of both the costs and benefits of the Commission's discretionary decisions as well as an extensive quantitative analysis of the final rule.

30

A.     **The Commission reasonably accepted Congress's determination that the disclosure requirements would achieve the desired social benefits.**

In enacting Section 1502, Congress considered the potential effects of conflict minerals disclosure and determined that the disclosure regime it adopted would ameliorate, rather than exacerbate, the humanitarian crisis in the DRC.  *See* Section 1502(a); 155 Cong. Rec. S4697 (daily ed. Apr. 23, 2009) (statement of Sen. Feingold).  Having been directed by Congress to implement a specific regulatory approach, the Commission was not, as petitioners suggest, obligated to revisit Congress's judgment about the wisdom of that approach.  In assessing the rule's benefits, it was thus both appropriate and sufficient for the Commission to focus—as it did (*Adopting Release*, JA0781/2)—on determining the extent to which Rule 13p-1 "contribut[es] toward speeding achievement of [the] congressional mandate." *Charter Commc'ns, Inc. v. FCC*, 460 F.3d 31, 42 (D.C. Cir. 2006) (discussing *Consumer Elec. Ass'n v. FCC*, 347 F.3d 291, 303 (D.C. Cir. 2003)).

Petitioners and amici argue (Br.28; Academics Br.18-19) that Congress's delegation of rulemaking authority to the Commission, which has an obligation to analyze the economic impact of its rules, shows that the Commission was required to re-assess Congress's determination.  The plain language of the statute, however,

31

anticipates that *other* agencies and branches of government will assess the efficacy

of Section 13(p) and Rule 13p-1 in decreasing violence in the DRC.  The

Comptroller General, *not the Commission*, is required to report to *Congress* on "the

effectiveness of section 13(p) … in promoting peace and security in the [DRC] and

adjoining countries."  Section 1502(d)(2)(A).  Moreover, the State Department has

discretion to designate additional minerals as "conflict minerals" and charges that

department with developing a strategy "to address the linkages between human

rights abuses … and commercial products."  Section 1502(c)(1)(A).  Finally, it is

the President, not the Commission, who has the authority to revise or temporarily

waive the reporting requirements (Section 13(p)(3)) and ultimately to determine

that the disclosures are no longer needed (Section 13(p)(4)).[4]

    Petitioners' and amici's focus on predictions that implementation of Section

1502 would exacerbate the situation in the region (Br.16-18, 28-30; Academics

Br.20-21) is therefore misplaced.  Although the comments in the record were

decidedly mixed in their predictions of the effects of a disclosure regime on the

ground (*see supra* note 3), Congress chose a side in this debate by enacting Section

1502.  Indeed, as the comment letters they cite make clear (Br.17-18), petitioners'

---

[4]  For the same reasons, the argument made by amici that an assessment of benefits
was essential as "an important check on the SEC's ability … to perpetuate its own
powers" (Academics Br.19) fails.

stated concerns about a *de facto* embargo stem from the statute itself, and not any details of the Commission's rule.[5]  The Commission thus reasonably determined not to second-guess Congress's judgment, but rather to design a rule "to help achieve the intended humanitarian benefits in the way that Congress directed." *Adopting Release*, JA0781/2.[6]

Petitioners and amici also criticize (Br.27-28; Industry Br.8) the Commission's statement that "we are unable to readily quantify [Section 1502's social benefits] with any precision, both because we do not have the data to quantify the benefits and because we are not able to assess how effective Section 1502 will be in achieving those benefits."  *Adopting Release*, JA0780/3, 0795/2. Especially in the context of a mandatory rule in which Congress has made a determination of benefits, however, the difficulty of independently quantifying those benefits is certainly relevant in assessing the reasonableness of the scope of an agency's economic analysis.  And here, given Congress's determination and the

---

[5]  The final rule's incorporation of a transition period and exemption for minerals already outside the supply chain, discussed *supra* note 3, belies amici's argument (Academics Br.21) that the Commission "ignore[d]" these comments.

[6]  That Congress itself has determined that a specific regulatory approach—disclosure—will yield the social benefits it desires, also distinguishes this case from the dicta in *Public Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209 (D.C. Cir. 2004), on which petitioners and amici rely (Br.28, 30, 34, 42; Academics Br.18; Industry Br.8).

dearth of quantitative evidence in the record, the Commission's decision not to quantify the benefits was reasonable.

And contrary to petitioners' contention (Br.29-30), even if the Commission had independently assessed the benefits of Congress's disclosure regime and found them lacking, it could not, on that basis, have created exceptions to the statutory requirements that would undermine the statutory scheme.  *See Public Citizen v. FTC*, 869 F.2d 1541, 1556 (D.C. Cir. 1989) (agency cannot create exemptions to statutory requirements based upon the agency's perceptions of costs and benefits).

### B. The Commission did not err by engaging in a largely qualitative assessment of the marginal costs and benefits of its discretionary choices.

Petitioners argue that the Commission "apparently believed that Section 1502 excuses it from conducting an adequate cost-benefit analysis" (Br.32) and criticize the Commission for failing to quantify the incremental costs of its discretionary choices (Br.33-34; *see also* Industry Br.4).  But they ignore the Commission's extensive qualitative analysis of its discretionary choices in comparison to suggested alternatives.  *Adopting Release*, JA0787-0795.  No more was required.

The APA does not require the Commission to quantify the marginal costs and benefits of *every* choice made during a rulemaking.  *Stilwell v. Office of Thrift*

*Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009) (APA does not impose a "general obligation on agencies to produce empirical evidence.  Rather, an agency has to justify its rule with a reasoned explanation.").  Nor does this Court's case law interpreting the Commission's obligation to assess the effect of its rules on efficiency, competition, and capital formation impose an obligation to separately quantify the impact of *all* of its choices.  Rather, those cases fault the Commission for failing to quantify the impact of the rule it adopted.  *Business Roundtable*, 647 F.3d at 1150; *see also American Equity Inv. Life Ins. Co. v. SEC*, 613 F.3d 166, 178 (D.C. Cir. 2010); *Chamber*, 412 F.3d at 143-44.

Here, as discussed below, the Commission quantified the costs of the final rule.  And the Commission quantified the marginal benefits of its discretionary choices "to issuers and users of the conflict minerals information" where practicable.  *See*, *e.g.*, *Adopting Release*, JA0790 n.801 (cost savings per issuer from transition period); 0793 n.811 (number of issuers affected by change in timing of disclosure).  But it reasonably determined that quantification of the marginal benefits and costs of every single choice was neither practicable nor necessary, and therefore a qualitative analysis was appropriate.  *Id.* at JA0787/3.

Many of the benefits, such as increased flexibility for issuers and more reliable disclosure, were intangible and therefore not readily susceptible to

35

quantification.  *See*, *e.g.*, *id.* at JA0788 (reasonable country of origin inquiry will provide issuers increased flexibility and facilitate compliance); 0790 (transition period will improve due diligence); 0791/1-2 (requirement to use recognized due diligence framework makes reports easier to compare and improves their credibility); 0793/2-3 (method and timing of disclosure simplifies and standardizes it).  Other benefits could not be quantified because the Commission did not have access to the necessary data.  *See*, *e.g.*, *id.* at JA0792 n.805 (no empirical evidence regarding the scope of the use of recycled or scrap minerals).

Similarly, the Commission reasonably explained that it was unable to quantify the costs of its discretionary decisions because, despite the Commission's requests for specific data in the proposing release (75 FR 80,948, 80,964-80,970) and the extensive comment process, commentators failed to provide the necessary information.  *Adopting Release*, JA0787/3; *cf. Duncan*, 681 F.3d at 448 (rejecting challenge to a rule where the petitioner pointed to no study or empirical data that the agency ignored); *Vonage Holdings Corp. v. FCC*, 489 F.3d 1232, 1244 (D.C. Cir. 2007).

To the extent petitioners and amici argue that the Commission was nonetheless required to do its own studies to derive quantitative estimates of each of its discretionary decisions, that is not what the law requires.  *See Chamber*, 412

36

F.3d at 142.  As the Commission explained, it would have been "unable" to quantify the decisions "with any precision" because the requisite empirical evidence was not readily available.  *Adopting Release*, JA0787/3.

As petitioners themselves recognize, manufacturers and suppliers often consider their materials and supply chains proprietary information.  Br.9, 10. Thus, there is little public data indicating the number of issuers who, for example, are likely to encounter red flags in their reasonable country of origin inquiry.  It would therefore have been impracticable for the Commission to have "attach[ed] … numbers" (Br.33) to these choices, and it was reasonable for the Commission to rely on a qualitative analysis.  *See Chamber*, 412 F.3d at 142.  As the Supreme Court has admonished, "[i]t is one thing to set aside agency action under the [APA] because of failure to adduce empirical data that can readily be obtained.  It is something else to insist upon obtaining the unobtainable."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 519 (2009) (internal citation omitted); *see also Cablevision Sys. Corp. v.* FCC, 597 F.3d 1306, 1314 (D.C. Cir. 2010); *ConocoPhillips Co. v. EPA*, 612 F.3d 822, 841 (5th Cir. 2010).

Petitioners contend that, without engaging in a quantitative analysis, the Commission could not determine that any burdens the rule imposed on competition were "necessary or appropriate" in furtherance of the purposes of the Exchange

37

Act.  Br.33-34 (citing Section 23(a)(2)).  They ignore, however, that the

Commission "tried to reduce the burden of compliance" where possible "while

remaining faithful to the language and intent of" Section 1502.  *Adopting Release*,

JA0724/2.  Thus, most of its discretionary decisions reduced the burdens of the

rule.  And in the one area where the Commission did not go as far as petitioners

would like—the reasonable country of origin inquiry (Br.32-33)—the Commission

determined the petitioners' approach was inconsistent with the intent of new

Section 13(p) of the Exchange Act (*Adopting Release*, JA0789/1), which mandates

the rule.  In the context of such a mandate where quantitative data is neither readily

available nor provided by commentators, the decision to engage in a qualitative

analysis was reasonable.  *Cf. Consumer Elec. Ass'n*, 347 F.3d at 303 (range of

costs estimated "sufficient for the task at hand"); *see also State of Cal. v. Watt*, 712

F.2d 584, 605 & n.105 (D.C. Cir. 1983) (cost-benefit analysis sufficient where

agency used it "only for generalized conclusions" such as assessing "order of

magnitude approximation" and not "for making narrow distinctions" between

potential regulatory alternatives).

Amici similarly argue that the Commission should have "analyzed the

market for conflict minerals mined by armed groups in the Congo" (Industry Br.7)

to assess the incremental impact on the ground in the DRC of interpretive decisions

such as whether to include a *de minimis* exception or issuers who contract to have

products manufactured. *Id.* at 10-11, 26. The Commission acted reasonably in

accepting Congress's decision that the disclosure scheme mandated by Section

1502 would lead to social benefits in the DRC. And the Commission reasonably

determined that excluding *de minimis* uses or issuers who contract to have products

manufactured would undermine that scheme. *Infra* 43-54. In that context, and

because sufficient quantitative data was not available, the Commission's

qualitative discussion of the impact of these decisions (*Adopting Release*, JA0743,

0790/3) was sufficient.

## C. The Commission conducted a thorough quantitative analysis of the costs of the final rule.

The Commission did provide a comprehensive quantitative analysis of the

costs of the final rule. *Adopting Release*, JA0795-0799. In compiling this

analysis, the Commission critically evaluated the widely divergent estimates

provided by commentators, including petitioners, and integrated those estimates

into a reasonable range of costs. *Id.* at JA0796/1-2. Petitioners' contention that, in

doing so, the Commission underestimated the costs of the rule (Br.31-32) is simply

incorrect.

39

The Commission built its estimate around the comments from the two groups—petitioner National Association of Manufacturers ("NAM") and a university group—that provided the most comprehensive estimates of the aggregate costs of the rule. *Adopting Release*, JA0796/1. It modified these commentators' estimates, however, to account for information from others who commented on these estimates. *Id*. at JA0796/2. Petitioners challenge the Commission's estimates of two components of this calculation—information technology costs and the average number of suppliers. These challenges, however, fall far short of meeting their "high" burden to show prejudicial error. *Nat'l Ass'n. of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012).

Petitioners first complain that the Commission accepted a mid-level estimate of IT costs for small companies, as opposed to the high-end estimate provided by petitioner NAM, "simply because a third commenter … had estimated such costs to be lower still." Br.31. The Commission, however, appropriately assessed *all* of the evidence before it to arrive at a reasonable estimate.

The "third commentator" petitioners mention pointed out that NAM's estimate was based upon the most expensive systems on the market and was ten times the total annual sales for all software dealing with restricted materials. *Adopting Release*, JA07961/3 (*quoting* Claigan JA0646). And while the

40

Commission found that this commentator did not provide "a factual basis" for the lower estimate it provided ($35,000) (Br.31), the above reasoning provided a rational basis for concluding small companies were unlikely to incur the high costs NAM estimated. *See Consumer Elec. Ass'n*, 347 F.3d at 303. Moreover, the mid-level estimate the Commission adopted—$205,000 for small companies (as opposed to the $1,000,000 NAM estimated for all issuers, regardless of size)—was provided by the university group and based upon the results of a survey commissioned by yet another commentator. *Adopting Release*, JA0796/3.

Nor did the Commission err in assuming that large issuers' IT costs would be double those of smaller companies rather than four times, as NAM and the university group estimated. Br.31. As already described, comments suggested that NAM overestimated the actual costs that would be incurred, even for large issuers (*see* Claigan JA0646; Assent JA0657), and the university group's estimate for large issuers relied on NAM's estimate. It was therefore reasonable for the Commission to lower its own estimate.

Petitioners also challenge the number of suppliers estimated to be affected by the rule. The Commission, however, reasonably determined that many commentators' estimates of the number of affected suppliers failed to account for the fact that many issuers may use the same suppliers. *Adopting Release*,

41

JA0797/3.  And while the university group did attempt to account for this overlap, its estimate of affected suppliers—860,000—was still higher than would be expected given other evidence in the record and the public domain.  *Id.*  The Commission therefore reasonably relied on a lower number—278,000—which was more consistent not only with other comments, but also with the total number of manufacturing businesses as measured by the Census Bureau.  *Id.*

Finally, petitioners contend that the Commission "arbitrarily" declined to use NAM's estimate of the average number of first tier suppliers "*simply because other commentators had lower estimates*."  Br.31 (emphasis added).  Far from being arbitrary, however, the Commission is required to reasonably examine *all* of the comments in the record.  And, indeed, NAM's estimate (2000) was significantly higher than that provided by another commentator (163).  *Adopting Release*, JA0797/1.  In this circumstance, the Commission's reliance on a mid-level estimate provided by the university group (1,060) was rational.

\*      \*      \*

Finally, petitioners appear to suggest that the rule is simply too burdensome, and that burden in and of itself is reason to vacate.  Br.23, 31-32.  But the Commission acknowledged that the rule is costly (*Adopting Release*, JA0724, 0781/2, 0795/2) and "tried to reduce the burden of compliance in areas in which [it

42

had] discretion" (*id.* at JA0724/2). And in the few areas in which the Commission

rejected approaches suggested by commentators to lower the costs, it did so based

upon its reasonable conclusions (*see infra* 43-60) that these approaches would

undermine the disclosure scheme Congress intended. *See*, *e.g.*, *Adopting Release*,

JA0736, 0743, 0759. Under these circumstances, the mere fact that the costs of

this mandatory rule are high does not provide a basis to vacate.

## II.    The Commission Interpreted Section 1502 Reasonably.

Petitioners challenge a number of the Commission's interpretive decisions,

arguing both that they were erroneous and that they arbitrarily increased the costs

of the rule without any indication of benefits in the DRC. As already discussed,

however, the Commission reasonably determined not to second-guess Congress's

judgment that Section 1502 would result in benefits to the Congolese people.

Moreover, the Commission's interpretations were reasonable in light of the

language and purpose of the statute, as well as the record evidence, and are entitled

to deference.

### A.    The Commission's determination not to adopt a *de minimis* exception was reasonable.

After a thorough review of the text, structure, and purposes of Section 1502,

as well as the record before it, the Commission concluded that creating a *de*

43

*minimis* exception would "thwart, rather than advance," the purposes of the statute. *See Adopting Release*, JA0740, 0743. In arguing that this interpretation was arbitrary (Br.35-40), petitioners misconstrue the adopting release and ignore comments supporting the Commission's conclusion.

*First*, contrary to petitioners' arguments, the Commission did not conclude that it "lacked authority" to create or that it "was *precluded* from considering" a *de minimis* exception. Br.35 (emphasis in original). Rather, the Commission appropriately examined whether such an exception would further the disclosure scheme Congress envisioned. *Adopting Release*, JA0743.

The Commission appropriately began this analysis by looking to the text of the statute. *See Public Citizen v. Young*, 831 F.2d 1108, 1113 (D.C. Cir. 1987). As the Commission noted, Section 1502 "itself does not contain a *de minimis* exception" even though Congress explicitly included such a threshold in Section 1504 of Dodd-Frank, which creates disclosure requirements for resource extraction issuers. *See Adopting Release*, JA0743/1-2. Although not dispositive, this suggests that Congress acted intentionally in not providing such a threshold in Section 1502. *See Catawba County v. EPA*, 571 F.3d 20, 36 (D.C. Cir. 2009) (per curiam).

44

Further, the Commission reasonably concluded that the "express" limitation in Section 1502—that a conflict mineral must be "necessary to the functionality or production" of an issuer's product—counseled against creating a *de minimis* exception because it showed that Congress understood that "a conflict mineral used in even a very small amount could be 'necessary' to the product's functionality or production." *Adopting Release*, JA0743/1. The co-sponsors of Section 1502 made this very point in a comment letter, writing that they "carefully considered," but "intentionally" decided not to include a *de minimis* exception, instead using the "necessary to the functionality or production" language to limit the scope of the disclosure requirement. Durbin JA0103. And this Court has held that the absence of a *de minimis* exception from a statutory provision is relevant to the decision whether to create such an exception through implication, especially where the statute contains other express limitations on its scope. *See Nat'l Lime Ass'n v. EPA*, 233 F.3d 625, 640 (D.C. Cir. 2000); *Public Citizen*, 869 F.2d at 1554.

Petitioners nonetheless argue that Dodd-Frank "did not repeal" the Commission's general exemptive authority and agencies have implicit authority to create *de minimis* exceptions. Br.36. But the Commission's analysis was consistent with both sources of authority. The Commission's general exemptive authority requires a finding that an exemption is "necessary or appropriate."

45

Exchange Act Section 36(a)(1), 15 U.S.C. 78mm(a)(1).  Similarly, an agency's

implicit authority to craft a *de minimis* exception is "not an ability to depart from

the statute, but rather a tool to be used in implementing the legislative design."

*Ala. Power Co. v. Costle*, 636 F.2d 323, 360 (D.C. Cir. 1979) (per curiam).  Thus,

the Commission's conclusion that creating a *de minimis* exception would "thwart,

rather than advance" the purposes of Section 1502 (*Adopting Release*, JA0743/3),

was ample reason to decline to create such an exception under either its general or

its inherent authority.

 *Second*, petitioners reprise their arguments about the Commission's cost-

benefit analysis, questioning whether purportedly *de minimis* uses of conflict

minerals "materially affect conditions in the region" (Br.38) and complaining that

tracing such uses is costly (*id.* at 39-40).  But Section 1502 on its face applies to

all—even small—uses of conflict minerals, so long as those minerals are

"necessary to the functionality or production" of an issuer's products.  It was not

for the Commission, through *de minimis* exemptive authority, to find that

"Congress overreached" and to bring the statutory "requirements back into line."

*Public Citizen*, 869 F.2d at 1557.

 Moreover, the Commission's determination that creating a *de minimis*

exception "'could have a significant impact on the rule'" (*Adopting Release*,

46

JA0743/2 (quoting State JA0435) was consistent with the views of the State

Department and many other commentators. *See supra* 15. As the co-sponsors of

Section 1502 explained, "the weight of the conflict minerals so essential to many

products is very small, and the percentage by weight or dollar value of the conflict

minerals as a proportion of unit cost is often also very small." Durbin JA0103; *see*

*also* Matheson JA0602 (a computer logic chip contains "perhaps a few milligrams

of tantalum," but the semiconductor industry "as a whole consumes over 100 tons

of tantalum metal annually").

Petitioners may disagree, but on this record they cannot show that the

Commission's decision ran "counter to the evidence before [it]" or that it was "so

implausible that it could not be ascribed to a difference in view." *Motor Vehicle*

*Mfrs. Ass'n*, 463 U.S. at 43. Indeed, petitioners do not dispute that conflict

minerals are widely used in small amounts and concede that a *de minimis*

exception would exclude "many companies" from the requirements of the rule.

Br.39; *see also id*. at 7; *see generally* Industry Br.[7]

---

[7] Amici appear to argue that the Commission should have used a *de minimis*
exception to exclude entire industries that do not "usually come to mind when
discussing the conflict minerals issue." Industry Br.12. Section 1502, however, is
not limited to particular industries.

Petitioners also contend that the Commission "did not analyze" the various *de minimis* thresholds suggested by commentators (Br.37), but the Commission specifically described these thresholds. *Adopting Release*, JA0740/2. And the Commission's broader conclusion that "[c]onsistent with the views of the State Department, we believe Congress intended the disclosure provisions to apply to the use of even small amounts of conflict minerals originating in the Covered Countries" (*id.* at JA0743/2) necessarily precluded the adoption of any of them.[8] This analysis satisfies the Commission's obligation to "consider" reasonable alternatives. *Chamber*, 412 F.3d at 143.

The Commission also properly concluded that, although a *de minimis* exception would have lowered compliance costs (*Adopting Release*, JA0743/2; *see also* Br.39-40), concerns about those costs did not justify creating the exception. As this Court recently reiterated, an agency "may not substitute its policy for that of Congress" by creating a *de minimis* exception simply because a statutory requirement is "onerous" and the agency "deems it more costly than beneficial."

---

[8] NAM's suggestion that the rule exclude "issuers who use less than 0.01 percent of the global usage of a certain conflict mineral" (Br.37), for example, would exclude issuers that use up to 25.3 tons of tin per year—not a *de minimis* amount. *See* Br.8 n.3 (stating that 253,000 tons of tin are mined per year). Moreover, Section 1502 is concerned with issuers' use of conflict minerals *from the Covered Countries*, so a *de minimis* threshold based on *global* usage of a conflict mineral would not advance the purpose of the legislation.

48

*Sierra Club v. EPA*, No. 10-1413, 2013 WL 216018, at *10 (D.C. Cir. Jan. 22, 2013); *accord Public Citizen*, 869 F.2d at 1557.

While petitioners also complain about the inclusion of catalysts (Br.39-40), they do not dispute that catalysts are "necessary to the production" of products. Because such catalysts are therefore included within the statutory mandate (Br.39-40), the Commission reasonably determined that excluding catalysts altogether would have been inconsistent with the text and purpose of Section 1502. *See Adopting Release*, JA0742/3. Indeed, small individual uses can have large aggregate effects, and there was evidence before the Commission that catalysts make up "a significant market for the minerals." *Id.* at JA0742/3 & n.238 (internal quotation marks omitted). Thus, it was not arbitrary or capricious for catalysts to be included in the rule. The Commission, however, read Section 1502 to require that catalysts be contained in a product to be covered by the rule. *Id.* at JA0741.

Finally, petitioners and their amici ignore other limitations in the final rule that mitigate compliance costs. For instance, to "address[] some of the concerns regarding *de minimis* amounts of minerals," the final rule focuses on whether a

49

conflict mineral "was intentionally added" to the product and does not apply where the mineral is a naturally occurring by-product.  *Id* at JA0741/3, 0743/3.[9]

### B.     The Commission's interpretation of Section 1502 to include issuers who "contract to manufacture" products was reasonable.

The Commission reasonably determined that Congress intended Section 1502's disclosure requirements to apply to products that are contracted to be manufactured.  *Adopting Release*, JA0736/1.  In order to "effectuate[] this intent," the Commission "includ[ed] issuers who contract to manufacture their products in the scope of the rule."  *Id.*  In their comment letters, petitioners appeared to agree with this approach.  BRT JA0273; Chamber JA0260; NAM JA0383.  But they now argue that the Commission "seriously misread" Section 1502 by including issuers who contract to manufacture in the scope of the rule because the definition of a "person described" does not include the phrase "contract to manufacture."  Br.47.

_____

[9]  Amici's "case studies" are also unpersuasive.  Industry Br.14, 17.  The Commission considered arguments that the definition of "conflict mineral" should not include organic metal compounds formed from a conflict mineral metal derivative, and limited the final rule's coverage to gold and the most common derivatives of the other minerals in the statute—tin, tantalum, and tungsten. *Adopting Release*, JA0729/1, 0730/2.  Moreover, amici's concerns that the rule "could be read to include a product's packaging" (Industry Br.20) are overstated, as nothing in the release states that packaging is included.  Similarly, from the limited facts presented, it appears that amici's concerns about new formulations of products (*id.* at 17) would be addressed by the explicit exclusion of prototypes and demonstration devices.  *Adopting Release*, JA0743/1.

As the Commission explained, however, the statute also requires issuers that must file a Conflict Minerals Report to describe their "products manufactured *or contracted to be manufactured* that are not DRC conflict free."  Exchange Act Section 13(p)(1)(A)(ii), 15 U.S.C. 78m(p)(1)(A)(ii) (emphasis added).  Congress included products "contracted to be manufactured" in the reporting requirement to prevent manufacturers from evading that requirement by contracting for the manufacture of their products.  *Adopting Release*, JA0737/1.  Yet if "person described" were not read to include issuers that "contract to manufacture," issuers who contract to have products manufactured (but do not themselves manufacture products) would not be required to proceed to steps two and three and would never be required to determine the origin of the conflict minerals in those products.  As the Commission reasonably concluded, such a reading of the statute "would be internally inconsistent."  *Id.* at JA0736/1.

It would also fail to advance the statute's purpose.  Congress intended for there to be disclosure about products that are contracted to be manufactured, and there is no discernible reason for excluding a portion of those products.  *Id.* Indeed, commentators informed the Commission that "conflict minerals are most commonly used in electronics and other technological products that may be manufactured by a different entity than the one that brands, markets, and profits

51

from the product."  Enough JA0280; Durbin JA0103 (stating that if issuers "that

contract the manufacture of goods … are exempt from reporting, then a large, non-

transparent use of the black market for DRC conflict minerals would remain,

directly subverting the policy intention of the law").  Thus, the Commission's

inclusion of issuers who contract to manufacture was reasonable.

Petitioners assert that "Congress's use of different terms … generally

implies that different meanings were intended'" (Br.47) (citation omitted; ellipsis

in original), and therefore the failure to include "contract to manufacture" in the

definition of a "person described" precludes including issuers who contract to have

products manufactured.  "When interpreting statutes that govern agency action,"

however, this Court has "consistently recognized that a congressional mandate in

one section and silence in another often 'suggests not a prohibition but simply a

decision *not to mandate* any solution in the second context, *i.e.*, to leave the

question to agency discretion.'"  *Catawba County*, 571 F.3d at 36 (citations

omitted) (emphasis in original).

Thus, Congress's inclusion of products "contracted to be manufactured" in

the reporting requirement, but not in the definition of a "person described," does

not unequivocally indicate a congressional intent to exclude issuers who contract to

have products manufactured from the rule.  *See United States v. Western Elec. Co.*,

52

894 F.2d 1387, 1391 & n.5 (D.C. Cir. 1990) (citing *Charles Peckat Mfg. Co. v. Jarecki*, 196 F.2d 849, 851 (7th Cir. 1952) (patent holder who contracts with fabricator is "manufacturer")); *cf. Aeronautical Repair Station Ass'n v. FAA*, 494 F.3d 161, 166-70 (D.C. Cir. 2007). Rather, as the Commission recognized, it merely "raised some question" as to whether such issuers should be included. *Adopting Release,* JA0733.

Petitioners also argue that by including products "contracted to be manufactured" in the reporting requirement, but not in the definition of a "person described," Congress chose "a narrower trigger in determining the companies to which the rule would apply" and then "expand[ed] the products to be included in those companies' reports." Br.48. But this reading of the statute would also be internally inconsistent. The requirement to perform due diligence under Section 1502 is triggered by a statutory reference to "such minerals." The phrase "such minerals," in turn, refers back to the definition of a person described. As a result, if the definition of a "person described" is not read to encompass issuers who contract to manufacture, manufacturing issuers would be required to describe products they contract to have manufactured that are not DRC conflict free in a Conflict Minerals Report without being required to perform the due diligence the statute requires to make this determination. *Adopting Release*, JA0736.

53

Petitioners (Br.24) and amici (Industry Br.23) also ignore specific guidance the Commission gave regarding the scope of the term "contract to manufacture." In response to comments from petitioners and others, the Commission explained that an issuer is not viewed as contracting the manufacture of a product for purposes of the rule if it does "no more than":  (1) specify or negotiate contractual terms with a manufacturer that do not directly relate to the manufacturing of the product; (2) "affix[] its brand, marks, logo, or label to a generic product manufactured by a third party"; or (3) "servic[e], maintain[], or repair[] a product manufactured by a third party."  *Adopting Release*, JA0736/3.[10]

## C.  The Commission's adoption of the reasonable country of origin inquiry was reasonable.

Section 1502 requires companies to disclose "whether" their necessary conflict minerals "did originate" in the Covered Countries and, if so, to perform due diligence regarding the source of those minerals and submit an audited Conflict Minerals Report.  Exchange Act Section 13(p)(1)(A), 15 U.S.C. 78m(p)(1)(A).  The statute, however, does not specify the steps that an issuer must take to determine "whether" its conflict minerals "did originate" in the Covered Countries.  *Adopting Release*, JA0758/3.  The Commission clarified this ambiguity

---

[10]  The legislative history petitioners cite (Br.47) is consistent with the Commission's interpretation of Section 1502, which excludes pure retailers but includes issuers that have a role in the manufacturing of their products.

54

by requiring issuers to perform a "reasonable country of origin" inquiry to make this threshold determination. *Id.* at JA0788/1; *see also* NAM JA0386-0387 (agreeing with this approach). Petitioners mistakenly argue both that the statute unambiguously forecloses the Commission's approach (Br.41-43) and that it is too onerous (Br.43-46).

*First*, petitioners argue that because Section 1502 requires that issuers conduct due diligence and submit a report when conflict minerals "did originate" in the Covered Countries, the Commission misread the statute by requiring that some issuers who do not know with certainty that their conflict minerals originated in the Covered Countries conduct due diligence. Br.41-43. This argument misreads both the rule and the statute.

Even if an issuer is unable to determine the origin of its conflict minerals with certainty, if its reasonable country of origin inquiry yields no reason to believe its minerals may have originated in the Covered Countries, it is not required to conduct due diligence. And contrary to petitioners' characterization (Br.41-42), if an issuer's reasonable country of origin inquiry does provide a reason to believe its minerals may have originated in the Covered Countries, the issuer is still not invariably required to submit an audited Conflict Minerals Report. Such an issuer must perform due diligence on its supply chain, but if that due

55

diligence reveals either that the issuer's minerals did not originate in the Covered Countries or were from recycled or scrap sources, no report or audit is required. *Adopting Release*, JA0758-0759. A report is required only if an issuer encountered a red flag during its reasonable country of origin inquiry and its due diligence does not reveal the source of its minerals. But even then, an audit is not required in the first two (for large issuers) or four (for small issuers) years. *Id.* at JA0766-0767.

These requirements are consistent with the statute. Petitioners do not dispute that issuers must conduct *some* inquiry to determine where their conflict minerals originated. Br.43. And the statute is silent with respect to the disclosure obligations of issuers who, following that inquiry, do not know "whether" those minerals "did originate" in the Covered Countries. The Commission reasonably determined that requiring the further step of due diligence when (but only when) such issuers encounter red flags during their reasonable country of origin inquiry was necessary to achieve the disclosure aims of the statute. *Adopting Release*, JA0759/1. Petitioners argue that the Commission was unable to "point[] to any benefit" of this approach (Br.42), but, as the Commission reasoned, without such a requirement issuers would have an incentive to avoid learning the source of their minerals. *Adopting Release*, JA0759/1.

56

Petitioners focus on the Commission's statement that allowing issuers that discover their conflict minerals came from a smelter using minerals from the Covered Countries to stop their inquiry would create an incentive for issuers to avoid learning the source of their minerals.  Petitioners assert that this reasoning was "erroneous[]" because "in most cases, companies *will not be able to trace their minerals to the smelter*."  Br.42-43 (emphasis in original).  But this argument misses the point—the Commission's discussion presented only one example of a red flag that could be encountered in the reasonable country of origin inquiry.  It is the proposition that issuers should be allowed to forgo due diligence despite encountering such red flags that the Commission rejected.

And petitioners' assertion that companies will not be able to trace their minerals to the smelter ignores record evidence demonstrating advances in infrastructure that have been made since the now-dated letters on which they rely.  *See, e.g.*, ICGLR JA0193 ("[I]t is a straightforward task to track minerals from the smelter … all the way down through various middlemen and processors … to the level of the comptoir or mineral buying house."); Enough JA0693 (listing major companies that have "proven that it is possible to source clean minerals from Congo"); *see also* USAID, *The Responsible Minerals Trade (RMT) Program* (Oct. 2012), *available at* http://www.resolv.org/site-

57

ppa/files/2012/06/RMT_DRC_FactSheet_Nov-15-2012-2.pdf.  Indeed, two years

ago, Apple, Inc. was able to map its entire supply chain "down to the smelter."

Fafo JA0561; *see also* GAO-12-763 at 16-21 (discussing stakeholder-developed

initiatives to facilitate tracing).

      Petitioners also argue that because the rule requires issuers to conduct a

good-faith inquiry, the Commission's concern about creating a disincentive for

issuers to learn the source of their minerals is illusory.  Br.43.  But under

petitioners' view, issuers could conduct a good-faith inquiry, encounter red flags,

yet not be required to conduct due diligence because at that point they still did not

know whether their minerals "did originate" in the Covered Countries.  The

Commission reasonably determined such an approach would undermine

Congress's goals.  *Adopting Release*, JA0759/1.  And the Commission reasonably

determined that allowing issuers that after due diligence *still* have reason to believe

that their minerals may have originated in the Covered Countries to avoid reporting

would undermine Congress's aims.  *Id.* at JA0758-0759/1.

      *Second,* petitioners contend that the reasonable country of origin inquiry is

too onerous because it "apparently requires companies to undertake the

extraordinarily burdensome task of attempting to trace their supply chains back to

the smelters or refiners."  Br.43.  They also assert that the Commission arbitrarily

rejected the "far less burdensome alternative" of allowing a manufacturer to "use 'flow-down clauses in supplier contracts.'"  Br.45.  These arguments lack merit.

The Commission did not prescribe the specific steps issuers must take to demonstrate compliance with the reasonable country of origin inquiry requirement. Instead, consistent with petitioners' comments, the Commission provided "general" guidance regarding that inquiry.  It recognized that the inquiry could "differ among issuers" and would evolve with developments in "the available infrastructure" and emphasized that any findings of the inquiry need not be made to a "certainty."  *Adopting Release*, JA0756-0759; *compare* NAM JA0389. Moreover, issuers are permitted to rely on reasonable representations from suppliers and/or smelters in certain circumstances.  *Adopting Release*, JA0757. Thus, the rule does not require "exact tracking of every stage of a component's manufacture" as petitioners suggest.  Br.44 (internal quotation omitted).

And while the Commission did not adopt petitioners' specific flow-down clauses proposal, consistent with its flexible approach, the Commission did not prohibit it either.  Indeed, the proposal—which they describe as including verification of the credibility of suppliers' information (Br.45)—appears consistent with Commission guidance.  *Adopting Release*, JA0757.  Petitioners cite one example of this guidance in arguing that the Commission foreclosed the use of

59

flow-down contracts.  Br.44 (citing *Adopting Release*, JA0757 (an issuer satisfies the reasonable country of origin inquiry if it "seeks and obtains reasonably reliable representations indicating the facility at which its conflict minerals were processed and demonstrating that those conflict minerals did not originate in the Covered Countries or came from recycled or scrap sources")).  But this example is merely—as it purports to be—guidance regarding one of many ways issuers may satisfy the reasonable country of origin inquiry.

> **D.    The transition period the Commission adopted was reasonable.**

The Commission determined that a two-year transition period during which issuers can describe their products as conflict undeterminable in their Conflict Minerals Report would be appropriate "to allow the necessary traceability systems in the Covered Countries to be established."  *Adopting Release*, JA0754/3.  The Commission extended the transition period to four years for smaller reporting issuers "because these issuers may lack the leverage to obtain detailed information regarding the source of a particular conflict mineral."  *Id.* at JA0768/1.  Petitioners' contention (Br.49-50) that the Commission acted arbitrarily in providing this longer transition period for smaller issuers is unfounded.

In petitioners' view, because many smaller companies are part of larger companies' supply chains, if small issuers "cannot comply for four years," larger

60

issuers who rely on small companies cannot be expected to comply in two years. Br.49-50. But the transition period does not alter any issuer's obligation to trace the source of its conflict minerals. The transition period simply allows issuers whose reasonable country of origin inquiry and due diligence do not determine the source of their minerals to describe their products as "DRC conflict undeterminable" and not audit their Conflict Minerals Report. Thus any smaller issuers in a larger issuer's supply chain will still be tracing their necessary minerals.[11]

And even if those smaller issuers do not themselves have the leverage to obtain detailed information regarding a particular conflict mineral's origin in two years, larger issuers should still be able to comply. *Adopting Release*, JA0768/1 n.570. Just as reasonably reliable representations indicating the origin of conflict minerals may come "*either* directly from that facility *or* indirectly through the issuer's immediate suppliers" (*id.* at JA0757/1) (emphasis added), larger issuers should be able to utilize their greater leverage to determine whether their products are DRC conflict free within two years. *See id.* at JA0767/3 n.568 (citing JVC JA0309 (since smaller reporting companies "lack the leverage to pressure suppliers

---

[11] For the same reason, petitioners are incorrect in asserting that the transition period is inconsistent with the Commission's statement, in declining to exempt small businesses from the rule, that small issuers "'could still be required to track and provide their conflict minerals information for larger issuers'" (Br.50).

and smelters to certify regarding the source of a particular conflict mineral," "we

believe it would be appropriate to allow smaller reporting companies even more

time" than larger companies to comply with the rule)).

Moreover, some small issuers subject to the four-year transition period may

not be part of a large issuer's supply chain.  In those circumstances, the purported

inconsistency petitioners complain of would not exist.  And larger issuers will be

relying on some small suppliers in their supply chains that are not reporting

companies subject to the rule at all.  There is no reason the allowance of a longer

transition period for those small suppliers that *are* subject to the rule and therefore

required to trace the origin of their conflict minerals increases the burden on large

issuers.

## III.    Section 1502 Does Not Violate the First Amendment.

Petitioners argue that Section 1502's requirement that certain issuers

disclose that their products have not been found to be conflict free violates the First

Amendment.  But mandatory disclosures of purely factual information have never

been understood to "compel speech" in violation of the First Amendment.  *See,*

*e.g.*, *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 316 (1st Cir. 2005)

(contrasting "compelled speech" cases with "routine disclosures of economically

significant information designed to forward ordinary regulatory purposes"); *Envtl.*

*Def. Ctr. v. EPA*, 344 F.3d 832, 849 & n.27 (9th Cir. 2003) (contrasting compelled disclosure of an "ideological message" with required disclosures of the "hazards of improper waste disposal").  Indeed, courts have found it "neither wise nor constitutionally required" to subject "[i]nnumerable federal and state regulatory programs [that] require the disclosure of product and other commercial information" to "searching scrutiny" under the First Amendment.  *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 116 (2d Cir. 2001).

Moreover, Section 1502 is wholly unlike the statutes compelling speech that have been subjected to strict scrutiny under the First Amendment.  It does not compel an individual to express or subsidize a message with which he disagrees. *See, e.g.*, *West Virginia Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943); *Wooley v. Maynard*, 430 U.S. 705 (1977); *United States v. United Foods, Inc.*, 533 U.S. 405 (2001).  It does not require speakers to alter the content of their own message.  *See, e.g.*, *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 798 (1988); *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 569 (1995); *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974).  And finally, it does not infringe on the rights of political association or belief. *See, e.g.*, *John Doe No. 1 v. Reed*, 130 S.Ct. 2811, 2818 (2010); *Davis v. FEC*, 128 S.Ct. 2759, 2777 (2008); *Buckley v. Valeo*, 424 U.S 1, 66 (1976).  In requiring

63

disclosures by regulated entities of accurate, factual information, Section 1502 does not "compel speech" in a manner that implicates core First Amendment concerns.

Petitioners argue that the required disclosures are not "purely factual" because they "will frequently be false" for issuers "unable to trace their supply chains to determine the minerals' origins." Br.52. But under the final rule the disclosure requirement applies only to issuers who know that their conflict minerals originated in the Covered Countries or had reason to believe that they did and have been unable to dispel that belief after two or four years of due diligence. The final rule also changed the language of the disclosure to require that companies disclose their products that have "*not been found to be* 'DRC conflict free'" and allows issuers to "add disclosure or clarification" to include the statutory definition of DRC conflict free or "otherwise address their particular situation." *Adopting Release*, JA0767/1-2 (emphasis added). These changes ensure that the rule always compels "an accurate disclosure" of factual information. *Id.* at JA0768/2.

Petitioners also contend that the revised disclosure is not "purely factual and uncontroversial" because it will "stigmatize" issuers. Br.52, 55. However, petitioners' asserted fear of "stigma" arising from factually accurate disclosures is

64

not sufficient to invoke strict scrutiny.  *See Meese v. Keene*, 481 U.S. 465, 478-85

(1987) (rejecting argument that requirement that materials be labeled "political

propaganda" violated the First Amendment because the public would attach an

"unsavory connotation" to the term).

     Petitioners also err in arguing that, "even if the disclosure were

commercial," Section 1502 would be subject to "intermediate scrutiny."  Br.53.  In

*R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205 (D.C. Cir. 2012), cited by

petitioners, this Court applied intermediate scrutiny because the graphic warnings

at issue did "not constitute the type of 'purely factual and uncontroversial'

information, or 'accurate statement[s],' to which the *Zauderer* [rational basis]

standard may be applied."  *Id.* at 1216 (citing *Zauderer v. Office of Disciplinary

Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985)).  As already discussed,

the rule requires the disclosure of purely factual and uncontroversial information.

     Petitioners further argue that the statute is "unduly burdensome" because it

is costly.  Br.53.  The "burdens" relevant to a First Amendment analysis, however,

are not monetary ones, but rather burdens on the right to free speech (*see, e.g.,*

*Zauderer*, 471 U.S. at 651-53).  As discussed above, in tailoring the regulations

implementing Section 1502 the Commission took a number of steps that minimize

65

any burdens on speech, including revising the disclosure, allowing additional disclosure, and allowing a transition period.

Finally, petitioners assert that Section 1502 "does not 'directly and materially advance[]'" a government interest, citing this Court's recent statement that "'the government cannot satisfy its burden by mere speculation or conjecture.'"  Br.53 (citing *R.J. Reynolds*, 696 F.3d at 1218-19).  "Publicity," however, "is justly commended as a remedy for social and industrial diseases."  LOUIS BRANDEIS, OTHER PEOPLE'S MONEY 62 (1933).  Here, Congress's determination that promoting peace and security in the DRC required greater transparency is a "value judgment based on the common sense of the people's representatives."  *Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1, 16 (D.C. Cir. 2009).  And, as this Court has held, the "fact that a congressional directive reflects unprovable assumptions about what is good for the people … is not a sufficient reason to find that statute unconstitutional."  *Id.* (citation omitted).

66

*     *     *

Because petitioners' challenges fail for the reasons discussed above, vacatur

must be denied.  In any event, the appropriate remedy is assessed on a case-by-case

basis.  *See Allied-Signal, Inc. v. NRC*, 988 F.2d 146, 150 (D.C. Cir. 1993).

## CONCLUSION

For the foregoing reasons, the order of the Commission should be affirmed.

Respectfully submitted,

GEOFFREY ARONOW
General Counsel

MICHAEL A. CONLEY
Deputy General Counsel

JOHN W. AVERY
Deputy Solicitor

TRACEY A. HARDIN
Assistant General Counsel

BENJAMIN L. SCHIFFRIN
Senior Litigation Counsel

DANIEL STAROSELSKY
Senior Counsel

*/s/ Daniel Staroselsky*
Securities and Exchange Commission
100 F Street, NE
Washington, DC  20549
(202) 551-5774 (Staroselsky)

March 2013

67

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,843 words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1).

I also certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally-spaced typeface using Word Perfect in 14-Point Times New Roman.

*/s/ Daniel Staroselsky*

## CERTIFICATE OF SERVICE

I hereby certify that on March 28, 2013, I electronically filed the foregoing Final Brief of the Securities and Exchange Commission, Respondent, with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. I also hereby certify that I caused eight paper copies of the foregoing to be hand delivered to the Clerk's Office. Service was accomplished using the CM/ECF system.

*/s/ Daniel Staroselsky*